## JOHN W. SAMIS vs. JAMES KING AND OTHERS.

The 64th section of the charter of the city of Bridgeport provides that it shall be the duty of the police commissioners to nominate to the common council suitable persons to fill all vacancies occurring among the officers or members of the police department, and to recommend, when in their judgment the interests of the city shall require it, the suspension or removal of any officer or member of the police force. Also that the common council shall have the sole power of appointment and removal of officers and members of said department, but that no person other than those nominated by the police commissioners shall be appointed, and no person suspended or removed except upon their recommendation; provided that in case of a failure on the part of the commissioners to make a nomination the council may proceed to fill the vacancies; but that the persons so appointed without a previous nomination by the commissioners, shall be only acting officers and members, and shall hold their appointment ad interim, until nominations shall have been duly made by the commissioners and confirmed by the council. The 25th section of the charter gives the common council power "to make ordinances relative to the city police." In April, 1872, the council made such an ordinance, providing that the police force of the city should consist of a captain, a first and second sergeant, and not less than ten nor more than twenty policemen, to be appointed in the manner provided in the charter, and to hold office until noon of the first Monday in June succeeding their appointment and until others should be appointed in their stead; provided that if the

Samis *v.* King.

police commissioners snould fail to nominate to the council on or before the first Monday in May of each year the council might proceed to appoint acting officers and members of the police force as in cases of vacancy. Held that, under both the charter and the ordinance, *ad interim* appointments could be made only upon a failure of the commissioners to nominate.

In May, 1873, the commissioners nominated among others, one Porter for second sergeant, and sixteen persons as policemen, among whom were "1st, Thomas Dinon," "2d, William Anderson, in place of Barney Farrell," and "3d, Norman Starr, in place of Patrick Bracken"; Farrell and Bracken having been policemen the year before. The nominations were confirmed by the council in part, but the council voted that Dinon take the place of Porter as second sergeant, and Farrell the place of one Sturtevant, and Bracken the place of Dinon, as policemen. Held that this action of the council was clearly unwarranted.

At the same meeting of the counsel these substitutes also received *ad interim* appointments. Held that the council could not, by refusing to appoint persons nominated by the commissioners, create vacancies which they could fill by *ad interim* appointments

Held also that the appointments, being in terms to supply the places of certain persons named who had been nominated by the commissioners, could not be regarded as applicable to any other vacancies, if any existed.

Held also that it was no argument in favor of the power of the council in the matter, that if the council should reject all the nominations made by the commissioners the city might be left without a police force, since all the officers in that case would, by the city ordinance, hold over till others were appointed in their places; besides which, such a contingency was not to be expected.

And held to be no objection to this view that the appointing power would thus be virtually in the police commissioners, for the charter intended that it should be so.

Dinon being nominated by the commissioners as policeman, and being appointed by the council as second sergeant *ad interim*, it was claimed that he belonged to the police force in one or the other capacity. Held not so, since his nomination as policeman was not confirmed by the council, and his appointment by the council as second sergeant was without a nomination by the commissioners.

The commissioners on the 7th of July, 1873, withdrew the nomination of Porter as second sergeant and nominated Gould, which nomination was rejected by the council. On the 11th of July a paper was received by the council signed by two of the four commissioners, stating that at a meeting of their board one Dalton was next proposed for second sergeant and received the votes of two of the commissioners, the other two voting against him. Held that this did not create a case of failure to nominate so that the council might appoint *ad interim*; the communication (1) not being authenticated by the clerk of the board nor by a majority of the members; and (2) amounting only to this, that the commissioners refused to withdraw the nomination of Gould and nominate Dalton.

Bracken and Farrell had been policemen in 1869 and had never been formally removed by the council on the recommendation of the commissioners. But the council, by an ordinance in April, 1872, undertook to remove all the

policemen from their offices, and though they were not removed or removable by such a proceeding, yet the commissioners treated them as duly removed and nominated others expressly in their places, who were appointed by the council. Held that this constituted a removal of them.

It being claimed that, conceding the appointments of Farrell and Bracken to be invalid, yet as they were made by the representatives of the city, as the council had extensive powers in the general matter and acted in good faith, and as the appointees had in good faith daily tendered their services and abstained from other employment, they ought to receive salaries notwithstanding. Held— 1. That no valuable services had been rendered upon which a *quantum meruit* could be sustained against the city. 2. That the right to a salary must on principle depend upon the legal possession of the office.

The tender of performance of the duties of an office to which the party tendering his services was not legally appointed, is an empty ceremony.

It is very questionable whether an officer *de facto*, who actually performs the whole duties of an office, can enforce payment of the salary. The authorities seem to favor the view that he cannot.

The city charter requires the city clerk to keep a record of the proceedings of the common council. The clerk made a record of certain proceedings at a meeting of the council, which the council at a subsequent meeting attempted to amend by a vote. Held that an amendment could be made only by the clerk or by order of court upon a mandamus, and that the attempted amendment was of no effect.

A motion for a new trial does not lie from decrees in equity. The statute requires the facts upon which a decree is based to be found, and the finding should be such as will enable a party by a writ or motion in error to present all the questions of law made in the trial.

The facts found in a motion for a new trial cannot be used as the finding of facts on which the decree was passed.

A petition for an injunction against the payment of salaries to policemen not legally appointed was brought against the clerk, auditor, and treasurer of the city, but the city itself was not made a party respondent. Held that it was not enough that the city assumed the defence of the case through its attorney; that the city was a necessary party, and that so long as it did not appear upon the record no decree could be passed against it.

The reversal of a decree granting a permanent injunction does not affect a temporary injunction that had been previously granted in the case.

PETITION for an injunction; brought to the Superior Court in Fairfield County, and heard before *Minor, J.*

The respondents were James King, R. B. Lacy, and R. T. Clark, respectively clerk, auditor and treasurer of the city of Bridgeport, and the petitioner, a tax payer of the city, sought to enjoin them respectively against drawing, certifying or paying an order, under a vote passed by the common council of the city, for the payment of salaries to Thomas Dinon as second sergeant of the police department of the city, and to

Patrick Bracken and Barney Farrell as policemen. A temporary injunction was issued when the petition was brought, and the court upon a hearing of the case granted a permanent injunction. The respondents moved for a new trial and also filed a motion in error. The facts of the case are fully stated in the opinion.

*H. C. Robinson* and *M. W. Seymour,* in support of the motions.

*Seeley,* contra.

SEYMOUR, C. J. The contest in this case arises from an unhappy difference between the police commissioners of the city of Bridgeport on the one side, and the common council of the city on the other.

The council at its meeting of August 4th, 1873, passed the following resolution: "The city clerk is hereby directed to draw his order on the city treasurer in favor of Thomas Dinon, second sergeant, for the sum of $90—in favor of Barney Farrell, for the sum of $85—and in favor of Patrick Bracken for the sum of $85; all of them having been appointed *ad interim* members of the police force, sworn in by his honor the mayor, and having reported regularly for duty since their appointment."

The petitioner, a tax-payer of the city, seeks by injunction to restrain the clerk, treasurer and auditor from complying with this vote. He avers that neither the said Dinon, Farrell, nor Bracken have been legally appointed to or become a part of the police department of the city, and that the foregoing resolution of the common council is illegal.

The council on the 26th of May, 1873, passed resolutions appointing Thomas Dinon second sergeant *ad interim* and Barney Farrell and Patrick Bracken policemen *ad interim.* The police commissioners regard these appointments as unauthorized, and the chief of police refuses to recognize the persons thus appointed as belonging to the police force and refuses them all employment as policemen. Acting however upon the vote of the council the three have reported daily for duty and abstained from other employment.

The Superior Court decided that these *ad interim* appointments were unauthorized by the charter and ordinances of the city and therefore granted the injunction prayed for. Certain defects and irregularities in the proceedings compel us to remand the case, but we fully concur with the Superior Court in holding the appointments invalid.

For the understanding of the reasons on which this opinion is founded, it is necessary to bring to notice the sixty-fourth section of the charter of the city, which section is as follows:—

"It shall be the duty of the police commissioners to nominate to the common council suitable persons to fill any and all vacancies that may for any cause, at any time during their term of office, occur or exist among the officers or members of the police department, and to recommend the suspension, removal or expulsion of any officer or member from office or membership in said department, whenever in the judgment of said commissioners such suspension, removal or expulsion shall be for the best interests of the city.

"The common council shall have the sole power of appointment and removal of officers and members of said department, but no person other than those nominated by the said board of police commissioners shall be appointed an officer or member of said department, and no person shall be suspended, removed or expelled from office or membership in said department, (unless in cases of malfeasance in office,) except on the recommendation of said board of police commissioners; provided that in case of a failure on the part of said commissioners for any cause to effect a nomination, the common council may proceed to fill any vacancies in said department, in which case the mayor shall have a casting vote; but the persons so appointed by the common council, without a previous nomination by the commissioners, shall be acting officers or members only, as the case may be, and shall hold their appointments *ad interim*, until nominations shall have been duly made by said board of commissioners and confirmed by said common council."

Under the twenty-fifth section of the charter the council has power to make ordinances "relative to the city police."

In April, 1872, the council made an ordinance relative to the police force, the first section of which is as follows:—

"The police force of said city shall consist of a captain of police, two sergeants, to be designated the first and second sergeant, and not less than ten nor more than twenty policemen, and not less than ten nor more than thirty special policemen, all of whom shall be electors of said city, shall be appointed in the manner provided in the charter of said city, shall be sworn to the faithful performance of the duties of their office before entering upon it, and shall hold their respective offices until noon of the first Monday in June next succeeding their appointment, and until others are appointed in their stead, unless sooner suspended or removed; provided however that if the police commissioners of said city shall fail to nominate to the common council on or before the first Monday of May, A. D., 1872, and on or before the first Monday of May in each succeeding year, persons to constitute said police force, said common council may, at any legal meeting thereof, proceed to appoint acting officers and members of said police force as in case of vacancy, who shall hold their respective offices as in said charter provided."

It was suggested in argument that this ordinance to some extent conflicts with the sixty-fourth section of the charter and to that extent is therefore void. Whether this be so or not it is not important here to decide, for in respect to the power of the council to make *ad interim* appointments, the charter and the ordinance both provide in the same words "that such appointments may be made by the council in case of a failure on the part of the commissioners for any cause to effect a nomination"; and it is clear that *ad interim* appointments cannot be made except upon such failure.

Had then the police commissioners failed to effect a nomination, so that on the 26th of May, 1873, the common council were authorized to make the appointments which were then made and which are now in question?

The record of the proceedings of the police commissioners shows, among other things, that on the 24th of May, 1873, John H. Porter was nominated for second sergeant, and six-

teen persons were by the board nominated as policemen, among whom is first, Thomas Dinon, second, William Anderson in place of Barney Farrell, and third, Norman Starr in place of Patrick Bracken; from which it appears that Farrell and Bracken had been policemen the preceding year, but were not nominated for the then coming year. This record was in the Superior Court objected to as evidence. It is duly certified by the clerk of the board, and was, we think, properly admitted as evidence of " the doings" of the police commissioners.

On the 26th of May, 1873, these nominations were laid before the common council and were confirmed by them in part; but the council voted that Thomas Dinon take the place of John H. Porter as second sergeant, that Barney Farrell take the place of H. L. Sturtevant, and that Patrick Bracken take the place of Thomas Dinon, nominated by the commissioners.

This substitution of persons to take the place of persons nominated by the commissioners is clearly unwarranted. The charter of the city, in its sixty-fourth section above recited, expressly provides that no person other than those nominated by the commissioners, shall by the common council be appointed an officer or member of the police department.

The common council evidently themselves regarded this their action as irregular, for at the same meeting these same substitutes also received *ad interim* appointments, and the validity of these last named appointments is, as before stated, the point now under consideration.

A preliminary question is here made, whether the official record of this meeting, duly certified by the clerk of the city, is to be treated as evidence of what took place at the meeting, or whether the record as attempted to be amended at a subsequent meeting of the council is to be treated as the true record.

The charter in its twentieth section provides, that the city clerk shall be clerk of the common council and shall make and keep true records of all the votes and proceedings of the common council, and also provides that such records shall

be in all courts evidence of the truth of the matters therein recorded. And the clerk is required to be sworn to the faithful performance of his duties.

If he should happen to make a mistake in his record he may doubtless correct it, and it may be corrected if erroneous by mandamus, but the record, until amended *by him*, or by order of court on mandamus, is the proper evidence of what took place at the meeting of May 26th, and was properly so regarded by the Superior Court.

We return then to the enquiry whether these *ad interim* appointments were valid. The counsel for the corporation sought to justify them by suggesting that the charter provides for twenty policemen, and, inasmuch as the commissioners nominated only sixteen, there was, *quoad* the four, such a failure to nominate as is contemplated by the charter to warrant *ad interim* appointments by the council; but this argument is fully met by two considerations.

First, the appointments are in terms to take the place of persons nominated by the commissioners and rejected by the council; and, secondly, the Superior Court finds as a fact that there was a mutual understanding between the commissioners and council that only sixteen policemen should be appointed.

The power of the common council to make *ad interim* appointments is in terms limited to " the case of a failure on the part of the commissioners for any cause to effect a nomination." Had such a failure occurred on the 26th of May?

The commissioners had that evening presented a full nomination, which was accepted by the council with three exceptions. The council then proceed to make the appointments in dispute.

To justify this action we must construe the charter as saying that, if the nominations of the commissioners are rejected, the council may proceed to make *ad interim* appointments; which *ad interim* appointments the charter provides " shall continue until nominations shall have been duly made by said board of commissioners and confirmed by said common council."

Such a construction of the charter vests the whole power of appointment in the common council and at once makes valueless the elaborate provisions of the charter for securing a non-partizan board of commissioners.

The charter is carefully framed to provide a police force that shall be selected without reference to political services. The mode of choosing the police commissioners is such that the board will usually consist of two from each of the leading political parties, and three members of the board must concur in order to make a nomination, but the entire scheme of the charter is made of none effect if the council may reject the nominations of the commissioners and at once proceed to make *ad interim* appointments to continue in force until nominations are made acceptable to the council, for it is to be observed that, although the mode of election prescribed by the charter is such that the common council will ordinarily be equally divided upon political questions, yet in regard to these *ad interim* appointments the mayor has a casting vote. He will generally represent the ruling political party of the city, and thus all the police force might and probably would be of one political party.

We cannot give our assent to a construction of the charter which leads to these results.

It is argued that if the nominations of the commissioners should happen to be such that the council deem it its duty to reject them all, then the city might be left without any police force. To guard against such a failure however, it is provided in the fifth section of the charter that all the officers shall hold their respective offices until others shall be duly chosen and qualified in their places; and then again it is not probable that a board, constituted as the police commissioners are, will agree upon nominations so unacceptable that all of them will be rejected. Enough of their nominees will doubtless always be accepted to furnish a police force adequate to the wants of the city, and moreover in general a good understanding probably will be maintained between the two boards, and if the council reject any of the nominations of the commissioners for sufficient reasons, the commissioners will

doubtless give due weight to the rejection and withdraw: the nomination and substitute another in its place.

It is also argued that, under the construction which we give to the charter, the appointing power is virtually in the police commissioners; but this is so, we think, to no greater extent than was intended by the legislature. The language of the charter is significant. Composed as the board of commissioners is, the legislature foresaw the difficulty that might arise of effecting an agreement and made provision for the case of disagreement, that the common council might then act; but if the commissioners were able to agree and effect a nomination the legislature intended, and we think wisely intended, to give ample credit and a decisive weight to such nomination.

At the next meeting of the common council, after that of May 26th, held June 2d, the board of police commissioners renominated the persons rejected, and the common council passed a resolution "that, as the nominations presented had been once acted upon, the recommendation of the same names by the commissioners be indefinitely postponed."

The council at this meeting of June 2d, and at their subsequent meetings, have treated their *ad interim* appointments as valid, and have from time to time passed resolutions ordering their appointees to be paid, and they have been paid accordingly until an injunction was issued prohibiting further payment.

Nothing has occurred since the meetings of May 26th and June 2d to change the legal aspects of the case, and we hold the appointment by the common council of Bracken, Farrell and Dinon to be unwarranted by the charter.

It was said in argument in behalf of Dinon, that, being duly nominated as policemen by the commissioners, and being appointed second sergeant *ad interim* by the common council, he at least ought to be held as belonging in the one capacity or the other to the police force; but his nomination as policeman was not confirmed by the council, and his appointment as second sergeant *ad interim* is invalid for the reasons herein before given.

In regard to Dinon it is further suggested, that on the 7th of July the commissioners withdrew their nomination of Porter as second sergeant and nominated Henry B. Gould to that position, and that nomination being rejected by the council, on the 11th of July a paper was received signed by two of the four commissioners, stating that at a meeting of their board Thomas Dalton was proposed for second sergeant and received the votes of two of the commissioners, two voting against him.

Upon these facts the respondents claim that the commissioners have failed to effect a nomination of second sergeant, and that the council might then properly proceed to do what they did, namely, again appoint Dinon second sergeant *ad interim*.

If the council had received a duly authenticated communication from the commissioners that they withdrew the former nominations and could not agree on any other, then doubtless the case would arise provided for in the charter in which the council might appoint; but, first, this communication is not authenticated by the clerk of the board, nor by a majority of its members; and, second, the paper if duly authenticated amounts only to this, that whereas on the 7th of July the board did effect the nomination of Gould, which was rejected by the council, the board now refuse to withdraw that nomination and refuse to nominate one Dalton, whose name was proposed for the vacant place.

The respondents in their argument spoke of this as a dead lock in the board of commissioners, but it is not found to be such by the Superior Court, nor does it appear to be such upon the evidence.

Whatever dead lock there is in the case arises from the disagreeing votes of the two boards and from the failure of the council to confirm the nomination of the commissioners, and if by such failure the power of appointment passes to the common council, then they, by the mere act of rejecting a nomination, become entitled to fill the police department with their own nominees. That is, the council can, by an act of their own, appropriate to themselves the whole power of appointment of the police force.

Another and distinct claim is made in behalf of Bracken and Farrell, namely, that they having been policemen in 1869 have never been duly removed from the office they then held, in the manner indicated by the sixty-fourth section of the charter; that is, by the common council on the recommendation of the board of police commissioners.

By the ordinance of April, 1872, the council undertook to legislate all the incumbents out of office, the removal to take place from and after the first Monday of June, 1872.

It is clear, we think, that Bracken and Farrell and their associates were not removed nor removable by the mere force of that ordinance, but the police commissioners acquiesced in the ordinance and by their acts confirmed it. They treated all the old incumbents as duly removed and nominated sixteen policemen *de novo*. Bracken and Farrell were, it seems, included in the nominations of 1872, but in 1873 sixteen policemen are again nominated *de novo*; William Anderson being nominated, as the Superior Court finds in place of Barney Farrell, and Norman Starr in place of Patrick Bracken. At the meeting of the council May 26th, 1873, Anderson and Starr are found by the Superior Court to have been confirmed and approved.

It thus appears that both the commissioners and council have concurred in 1872, and again in 1873, in the virtual removal of Farrell and Bracken from the office of policemen under and by virtue of the old appointment of 1869.

It is further to be noticed that this claim in behalf of Bracken and Farrell is made by the representatives of the common council by whose ordinance these incumbents were displaced, and who vote to pay them as policemen *ad interim* under the appointment of 1873, and not as policemen under an old appointment. The council have not intimated any purpose of recognizing the old appointments as such, and could not consistently do so. The whole matter at issue is upon the validity of the *ad interim* appointments.

The respondents further insist that, conceding the appointments in question to be unauthorized, yet they are made by the representatives of the city; that the council has extensive

powers over the police department and clear power in certain contingencies to make *ad interim* appointments; that the council has acted in good faith within the general scope of its power; and that its appointees, acting bonâ fide, have daily tendered their services and abstained from other employment, and ought therefore to receive their salaries notwithstanding the invalidity of their appointment. There is considerable force in this appeal, made as it is in behalf of men probably ignorant of the law and of the facts on which their right to compensation depends; but it is to be observed, first, that no valuable services have been rendered to the city for which a *quantum meruit* can be sustained, and secondly, the right to the salary of an office (as such, independent of actual and valuable service rendered,) must on principle depend upon the legal possession of the office. The tender of performance of the duties of an office to which the party tendering his services was not legally appointed, is an empty ceremony.

If these appointees of the common council sue the city for their salary, they must aver and prove that they were legally appointed to the office, the salary of which they demand. Cases may occur, and perhaps this is one of them, where the rule operates harshly, but public policy demands the universal application and enforcement of the rule.

Persons contracting with city officials are held bound to know the extent of their authority and cannot recover against the city upon contracts which the officials are not authorized to make. This rule is strictly observed by courts, and is regarded as necessary to protect communities from unlimited plunder. *Brady* v. *Mayor &c. of New York*, 20 N. York, 312; *Hodge* v. *City of Buffalo*, 2 Denio, 110. The city charter is a public act, the provisions of which are presumed to be known by all men. Persons taking appointments to office under the city council cannot be permitted to plead ignorance of the power of the council touching such appointments.

It is a grave question whether a merely de facto officer, even when he actually performs the whole duties of the office, can enforce the payment of the salary. The authorities seem to be that he cannot. *State* v. *Carroll*, 38 Conn., 471; *Riddle*

v. *Bedford County*, 7 Serg. & Rawle, 386 ; *Bentley* v. *Phelps*, 27 Barb., 524 ; *People* v. *Tiernan*, 30 Barb., 193.

However this may be, it is clear, we think, that the salary of an officer is not due to these parties, who are neither officers de jure nor de facto.

The common council has no power under the charter of the city to subject the city treasury to the payment of salaries to other than legally appointed officers, and every tax-payer of the city must be heard, if, in the legal and proper way, he asks the interposition of the court to prevent such unlawful payment.

It thus appears that we fully concur in opinion with the judge who tried the case in the Superior Court, upon the substantial questions at issue, and we have deemed it our duty to express our views fully, hoping thereby to settle the vexed questions which have so much disturbed the peace of the city. All the parties seem to be anxious to have an early settlement of the controversy, and in their haste to reach the result several irregularities have occurred, some of them too serious to be overlooked, and in consequence of which we are required to reverse the judgment and remand the case to the Superior Court for further proceedings, if indeed after this expression of our opinion any further proceedings should be necessary.

The case comes here upon a motion in error and a motion for a new trial. The latter motion is not authorized by the statute, nor is it sanctioned by approved practice. Cases have doubt-less occurred where bills in equity have been thus reserved for advice and have been acted upon without noticing the informal-ity. The statute requires courts of equity to make a finding of the facts on which their decrees are founded, and this finding should be full enough to present all the questions of law made in the progress of the trial, and the statute gives a writ or motion in error as the appropriate mode of reviewing these questions.

The record in the case under review is as follows :—

"This action first came to this court at its present term, when said parties appeared, and were at issue upon the

respondents' motion to dissolve said temporary injunction as on file. And upon said issue said parties having been fully heard before the court, and the evidence thereon considered, the issue was found by the court in favor of the petitioner, and that the injunction be perpetual."

If this is the whole record the judgment is manifestly without facts to support it, and, strictly speaking, this is the whole record. It was however manifestly intended that the facts found in the motion for a new trial should be regarded as part of the record and the foundation for the decree. On referring to the motion it appears that an agreement was made which in terms seems to authorize a final disposition of the case upon the motion to dissolve. There was however no agreement to waive the demurrer founded on the failure to make the city a party to the bill.

The city is clearly a necessary party, and on the suggestion by way of demurrer or otherwise of the omission the case should have been postponed or continued in order that the city might be made a party. The court however disregarded the demurrer and heard the case on its merits. The city actually took part in the trial through its attorneys, but no appearance is entered of record in its behalf, and of course no decree against it could be or was made.

The rule is familiar which requires that the city should be made a party in cases of this kind, (*Allen* v. *Turner*, 11 Gray, 436,) and the value and importance of the rule are strikingly illustrated in this case. The relief which the petitioner needs is the restraint of the common council from the appropriation of the money of the city to the payment of the council's appointees; not only from the particular payment which at the date of the petition had been voted, but from all future appropriations of the like nature under the same appointments.

Under the petition as it is no such restraint can be imposed. The injunction granted is in terms, (and perhaps in effect, but on that we express no opinion,) only against the payment of the sums appropriated by the vote of August 4th, amounting in all to $260, and perhaps as against the treasurer,

auditor and clerk, no more extensive injunction could be granted. If that be so, the Superior Court would seem not to have jurisdiction of the case, for unless the matter in demand exceeds five hundred dollars the exclusive jurisdiction is in the Court of Common Pleas. If the city were a party defendant the general prayer for relief is broad enough for an injunction within the jurisdiction of the Superior Court.

We therefore adjudge the decree manifestly erroneous, and remand the case to the Superior Court for such further proceedings as the parties may be advised are proper to be taken.

In doing this it is fitting perhaps that we should suggest that the reversal does not in any way impair or do away with the temporary injunction granted by Judge CARPENTER, which remains in full force until dissolved in due course of law.

In this opinion the other judges concurred.